UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CHRYSLER GROUP, LLC,

      Plaintiff,

v.                                   Case No. 14-12964

EAGLE AUTO-MALL CORP.,          HON. AVERN COHN

      Defendant.

_____/


**MEMORANDUM AND ORDER**
**GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Doc. 34)**

## **TABLE OF CONTENTS**

I.      Introduction                                                                  1

II.     Background                                                                    2
        A.      The Parties                                                          2
        B.      The Chrysler Bankruptcy and Dealer Fall Out                          2
        C.      Eagle's Arbitration under Section 747 and Subsequent
                Litigation                                                           4
        D.      The LOI                                                              5
                1.      In General                                                   5
                2.      The Terms of the LOI                                         5
                3.      The February 10 Visit                                        7
                4.      Eagle's Dealership Background                                9
                5.      FCA's Response to Eagle's LOI                                9
                6.      Events After the LOI was Executed                           10
                        a.      Eagle's Plans                                       10
                        b.      FCA's Response                                      13
                        c.      Eagle's Response to FCA                             14
        E.      This Case                                                           16

III.    Summary Judgment                                                            17

IV.     Analysis                                                                    18
        A.      Modification                                                        18
                1.      In General                                                  18
                2.      New Build                                                   20
                3.      Extend 8 Months                                             21
                4.      Overall                                                     26
        B.      Reformation                                                         26
                1.      In General                                                  26
                2.      Eagle's Reformation Claim                                   27
                3.      Discussion                                                  28
                4.      Reformation due to Impossibility                           31
        C.      Res Judicata and Collateral Estoppel                                31

V.      Conclusion                                                                  32

I.  Introduction

This is a business dispute in a automotive dealer relationship.  Plaintiff Chrysler Group, LLC[1] is suing Eagle Auto-Mall Corporation (Eagle) seeking declaratory relief on the grounds that Eagle has, or will, breach of a letter of intent (LOI) between the parties.

Eagle's amended counterclaim (Doc. 31) asserts the following claims:

| Count I | Declaratory Relief as to Modification of the LOI and FCA's Breach |
| Count II | Contract Reformation |
| Count III | Breach of Contract and Duty of Good Faith and Fair Dealing |
| Count IV | Fraud |
| Count V | Promissory Estoppel |

The case has been divided into two phases.  Phase I involves Eagle's claims for reformation of the LOI and modification.  Phase II involves the parties' remaining claims. Phase II has been stayed pending the outcome of Phase I.

FCA has moved for summary judgment on Counts I and II of Eagle's amended counterclaim, i.e the claims in Phase I.

For the reasons that follow, the motion will be granted.  As will be explained, the terms of the LOI control.  The LOI was neither orally modified by the parties nor is it subject to reformation.  This formally leaves FCA's claim for declaratory relief and Counts III, IV, and V of Eagle's counterclaim.  In reality, what is left is Eagle's breach of contract, fraud and promissory estoppel claims.

---

[1]Effective December 15, 2014, Chrysler is now known as FCA US LLC (FCA).

1

II.  Background[2]

The material facts as gleaned from the parties papers follow.[3]

A.  The Parties

FCA is the manufacturer and distributor of the Chrysler, Jeep, Dodge and RAM automotive vehicle lines.  FCA is organized under Delaware law with a principal place of business in Auburn Hills, Michigan.  Eagle is a New York corporation with its principal place of business in Riverhead, Long Island, New York.

The parties relationship dates back to 1997.  At that time, FCA's predecessor, Chrysler, awarded Eagle a Jeep dealership.  In 1998, Eagle obtained a Chrysler dealership.  As explained below, Eagle's dealership initially did not survive Chrysler's bankruptcy.  Apparently, a bone of contention between the parties was that Eagle operated its Chrysler and Jeep dealerships at the same facility it used for its Volvo, Mazda, and Kia dealerships instead of the exclusive dealor relationship Chrysler envisioned.

B.  The Chrysler Bankruptcy and Dealer Fall Out

In April 2009, Chrysler and certain of its subsidiaries and affiliates (Old Chrysler) filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of New York.  In June of 2009, Old Chrysler sold substantially all of its assets to

---

[2]Notwithstanding the detailed factual recitation, which is necessary for a full understanding of the parties' relationship, there is no genuine issue of material fact as to whether the LOI was modified or subject to reformation.

[3]The parties substantially complied with the Court's motion practice guidelines. They submitted a joint statement of material facts (Doc. 48).  Most of the background section is extracted from the joint statement.  The exhibits are separately tabbed but not highlighted.

FCA under a Sale Order entered by the Bankruptcy Court under 11 U.S.C. § 363(f).

The Sale Order also approved the assumption by Old Chrysler and assignment to FCA

of approximately 2,400 Chrysler, Jeep and Dodge dealer agreements.  See Eagle Auto

Mall Corp. v. Chrysler Group, LLC, 920 F. Supp. 2d 327, 329 (E.D.N.Y. 2013).

Eagle's dealer agreement with Old Chrysler was not among those assigned to

FCA.  Eagle, along with 788 other dealer agreements, was rejected by the Bankruptcy

Court's June 9, 2009 order under 11 U.S.C. § 365 (Rejection Order).  See Eagle Auto

Mall Corp. v. Chrysler Group, LLC, 920 F. Supp. 2d 327, 329 (E.D.N.Y. 2013); Doc. 31,

Eagle's Amended Counterclaim ¶¶ 13, 16 ("[Old Chrysler] filed a motion with the

Bankruptcy Court seeking approval to reject and terminate the franchise agreements of

789 dealers, including [Eagle].").  After June 2009, Eagle ceased doing business as a

Chrysler and Jeep dealer of new vehicles but it continued to sell and service old

Chrysler and Jeep vehicles.

In December 2009, approximately six months after the Bankruptcy Court entered

the Rejection Order, Congress passed § 747 as part of the Consolidated Appropriations

Act of 2010, Pub. L. No. 111-117, 123 Stat. 3034, 3219-21 ("Section 747").  Section 747

granted the right to a "covered dealership" to seek through binding arbitration to be

added to the dealer network of the "covered manufacturer" in the geographical area

where the "covered dealership" was located when its dealer agreement was terminated.

Eagle was a "covered dealership;" FCA was a "covered manufacturer."  Section 747(b).

Section 747 provides that, if the arbitrator finds in favor of a "covered dealership"

[Eagle], the "covered manufacturer" [FCA] shall as soon as practicable, but no later than

seven business days after receipt of the arbitrator's determination, provide the dealer a

3

customary and usual letter of intent to enter into a sales and service agreement.
Section 747(e).

        C.  Eagle's Arbitration under Section 747 and Subsequent Litigation

Eagle demanded arbitration under Section 747.  Eagle prevailed after a hearing
in June 2010.  In accordance with the arbitration decision, FCA provided Eagle with a
LOI.  Eagle refused to sign it, finding some of its terms commercially unreasonable.
Instead, in August of 2010, Eagle sued FCA in the District Court for the Eastern District
of New York, claiming, inter alia, that FCA had failed to provide Eagle with the
"customary and usual" letter of intent required by Section 747.  See Doc. 31,
Counterclaim at ¶ 28.  FCA defended, contending that LOI it offered to Eagle was
customary and usual within the meaning of Section 747.

On January 23, 2013, after two years of litigation, reviewing the terms of 135
letters of intent, and holding a trial on the merits, the district court ruled "that there is
overwhelming evidence" that the LOI offered to Eagle is the "customary and usual" letter
of intent and that the LOI "therefore complied fully with [Section 747's] requirements."
Eagle Auto Mall Corp. v. Chrysler Group, LLC, 920 F. Supp. 2d 327, 331 (E.D.N.Y.
2013).

Eagle appealed.  In a Summary Order issued on January 17, 2014, the United
States Court of Appeals for the Second Circuit affirmed, finding that the LOI issued to
Eagle was "customary and usual" as required by Section 747.  Eagle Auto Mall Corp. v.
Chrysler Group LLC, 550 F. App'x 69, 70 (2d Cir. 2014).

4

D.  The LOI

1.  In General

In January 2014, after the three years of litigation described above, FCA offered Eagle the same LOI that it had offered to Eagle in July 2010.

Eagle signed the LOI in January 2014, a few days after the Second Circuit's decision and sent it to FCA for signature.  FCA then signed it.  The effective date of the LOI is February 27, 2014.  However, as will be explained below, conversations took place between the parties prior to and after February 27 which Eagle says impacted and substantially altered the terms of the LOI.

2.  The Terms of the LOI

The LOI states that it constitutes the parties' entire agreement, and superseded all of their prior negotiations, understandings, correspondence and agreements relating to the subject matter of the LOI.  FCA's Ex. 3, LOI at CG000282, ¶ 17.  The LOI provided states that it cannot be amended without the prior written consent of FCA's National Dealer Placement Manager.  Id. at ¶ 16 ("This LOI cannot be . . . amended by [Eagle] without the prior written consent of [FCA's] National Dealer Placement Manager.").

In the LOI, FCA agreed to enter into Chrysler and Jeep Sales and Service Agreements with Eagle if Eagle provided a facility "for the exclusive display, sales and service of the Chrysler and Jeep vehicles" in compliance with the requirements of the LOI, including the completion of all requirements within the specified time periods.  Ex. 3, LOI at CG000279-CG000281, second paragraph from top and ¶ 8.

The LOI gave Eagle a choice of three facility options:

5

(a) Construct a new facility

(b) Renovate an existing facility

(c) Use a facility that already meets the facility requirements of the LOI.

Ex. 3, LOI at CG000283.

The LOI established specific time periods within which each facility option had to be completed:

(a) 18 months for the construction of a new facility

(b) 8 months for the renovation of an existing facility

(c) 90 days for the use of a facility that meets the facility requirements of the LOI

Ex. 3, LOI at CG000279 (second paragraph from top).  The end of the time period for each facility option is defined in the LOI as the "Expiration Date."  Id.

The LOI also states that Eagle's failure to complete each requirement within the specified time period and, in any event, no later than the Expiration Date, would be considered a material breach of the LOI for which FCA would have the right to terminate the LOI.

The LOI further states that FCA "has no obligation to extend any time periods set forth in this LOI, even if [Eagle's] inability to comply with a time period arises from a cause outside of [Eagle's] control."  Ex. 3, LOI at CG000281, ¶¶ 9-10.

The LOI states that the facility to be located on the approved site was for the exclusive display, sale and service of Chrysler and Jeep vehicles.  Ex. 3, LOI at CG000279-CG000281, second paragraph from top and ¶ 8.  The LOI also states that Eagle shall submit complete architectural plans and specifications for the exclusive facility to FCA's Network Manager for FCA's review and approval in writing.  Ex. 3, LOI

6

at CG000280, ¶ 6.

FCA advised Eagle in the LOI that FCA does not review Eagle's plans and specifications for compliance with any federal, state or local requirements and that Eagle is solely responsible for compliance with all legal requirements.  Id.

Eagle elected to renovate an existing facility within the eight month period specified in the LOI, as indicated by Mark Calisi's (Calisi), Eagle's owner and president, "X" beside the renovation option in the LOI, and Calisi's signature.  Ex. 3, LOI at CG000282; Ex. 4, Calisi Deposition at 98(9-22).

The LOI states that Eagle shall propose a site in writing for the facility referenced in the LOI.  FCA agreed to approve or disapprove the proposed site within 30 days of receipt of Eagle's proposal.  Ex. 3, LOI at ¶¶ 1-2.

By a letter to FCA dated January 29, 2014, Eagle proposed a site for its facility renovation (the Proposed Site).  Ex. 3, LOI at CG000279, ¶ 1Ex. 4, Calisi Deposition at 43(10-25); Ex. 7, 1/29/14 Calisi letter to Freeman at EAMC00035.

### 3.  The February 10 Visit

On February 10, 2014, after Calisi signed the LOI and sent it to FCA, and approximately two weeks after Eagle identified the Proposed Site, FCA's Dealer Network Manager for the Northeast Business Center, Brian Freeman (Freeman), and FCA's Area Manager for the Northeast Business Center, George Neubauer ("Neubauer"), visited and toured the Proposed Site with Calisi.  This was the first time that Freeman and Neubauer had visited the Proposed Site or met Calisi. Ex. 4, Calisi Deposition at 8 (13-16).

FCA's Northeast Business Center, where Freeman and Neubauer worked, is a

7

FCA regional office in Tappan, New York.  FCA's headquarters is located in Auburn

Hills, Michigan. Neither Freeman nor Neubauer had authority to approve changes to the

LOI.  As provided in the LOI, only FCA's National Dealer Placement Manager, who is a

senior manager at FCA's headquarters in Auburn Hills, Michigan, had the authority to

approve amendments to the LOI.  Ex. 3, LOI at CG000282, ¶ 16.

Eagle says that Freeman was FCA's "Dealer Network Manager" at the Northeast

Business Center, and FCA's primary contact with Eagle.  No one from Auburn Hills or

with the title "National Dealer Placement Manager" contacted Eagle regarding the LOI

or Eagle's plans for its dealership.  Exhibit A, Calisi Declaration, ¶ 11.

Eagle contends that as a result of this visit, FCA waived (i) the LOI's requirement

that Eagle provide a combined single facility for both sales and service, (ii) the LOI's

requirement for an exclusive Chrysler/Jeep service facility while Eagle constructed an

exclusive service facility after the renovation of its retail facility, and (iii) the LOI's 8

month expiration date.  Eagle's Exhibit A, Calisi Declaration, ¶ 14; Exhibit B –

Deposition of Freeman, p. 51 ln. 19-21 (Freeman says there was "no problem" with a

separate service facility across the street from the retail facility).

Eagle, through Calisi, also says that it signed the LOI in reliance on the

representation, understanding that FCA would negotiate with him in good faith relative

to the requirements of the LOI, including its stated 8 month expiration date.  Exhibit A,

Calisi Declaration, ¶ 10 and 16.

Eagle acknowledged in the LOI that it had the opportunity to review the

document with its legal counsel before signing it.  Ex. 3, LOI at CG000282, ¶ 15.  Eagle

was represented by counsel at the time it executed the LOI.  FCA's Ex. 4, Calisi

8

Deposition at 46(16-19).

### 4.   Eagle's Dealership Background

Eagle had experience in planning for and constructing a dealership facility in

Riverhead, New York prior to the time it signed the LOI.  In 2004, prior to the Effective

Date of the LOI, Eagle had planned for and completed construction of a 40,000 square

foot dealership facility at 1320 Old Country Road, Riverhead, New York 11901 that

houses the shared sales and service operations for Volvo/Mazda/Kia.  This construction

project involved obtaining permits and zoning approval from the Town of Riverhead,

construction of a new "ground up" building, the hiring of and working with an architect,

and the preparation of complete architectural plans and drawings. Ex. 4, Calisi

Deposition at 61(4-14), 61(21)-63(4); Ex. 6, Ferraro Deposition at 27(16)-28(17).

### 5.   FCA's Response to Eagle's LOI

Upon receiving the executed LOI from Eagle, FCA sent an email to Eagle dated

February 28, 2014, confirming Eagle's selection of the renovation option within eight

months. Ex. 5, 2/28/14 Neubauer email to Calisi at EAMC00216-EAMC00217 (confirms

"8 month Letter Of Intent to Renovate an existing facility in Riverhead, NY.").  FCA also

signed the LOI and delivered a fully executed copy to Eagle.  Ex. 3, LOI at

CG000279-CG000283.

Eagle says that although dated February 28, 2014, the letter was emailed to

Eagle on March 6, 2014 with a message stating: "Attached is a letter approving the site

you proposed."  Eagle's Exhibit D - March 6, 2014 email from George Neubauer to

Calisi.

9

6.  Events After the LOI was Executed

a.  Eagle's Plans

In a March 6, 2014 email, Eagle sent what it described as facility drawings relating to the Proposed Site to FCA.  FCA's Ex. 9, 3/6/14 Denise Ferraro email to Neubauer at CG000109-CG000123.

According to FCA, the drawings did not meet the LOI's square footage requirements and were not complete plans.  FCA's Ex. 10, 3/5/14 Tast email to Ferraro at EAMC00185-EAMC00190 ("[W]e still are very shy"); FCA's Ex. 11, 3/5/14 Tast email to Ferraro at EAMC00191-EAMC00192 ("[T]he differents [sic] are still fairly large").

On March 14, 2014, Eagle sent a letter to FCA committing to use the Proposed Site for its facility "[i]n accordance with the LOI issued to [Eagle] (page 1, bullet 3 within 30 days)."  Eagle did not mention in its letter any amendment to the LOI, including the alleged extension of the eight month time period within which to complete the renovation or the waiver of the exclusivity requirement.  FCA's Ex. 12, 3/14/14 Calisi letter to Freeman at EAMC00050-EAMC00051; Ex. 4, Calisi Deposition at 148(24)-149(25); 150(12-23).

The first architect that Eagle retained to work on the renovation project was Robert Tast (Tast).  Eagle hired Tast in mid-February 2014.  FCA's Ex. 13, Tast Deposition at 26(15-23); Ex. 4, Calisi Deposition at 53(14)-54(9), 211(20-23); FCA's Ex. 6, Ferraro Deposition at 15(2-16), 16(20-23), 64(4-20); FCA's Ex. 14. 2/27/2014 Adams email to Ferraro and Tast at EAMC00043-EAMC00046.

In an March 10, 2014 email, Calisi notified FCA that Eagle had hired another architect from Ghafari Associates, Scott Hann (Hann), for the "Chrysler Jeep facility."

10

Eagle did not believe that Tast was capable of handling the project and wanted to retain an architect with experience with Chrysler dealership requirements that Tast did not have.  FCA's Ex. 4, Calisi Deposition at 154(2-16); FCA's Ex. 6, Ferraro Deposition at 73(4)-74(4).  Calisi explained to FCA that Hann's company is one of the architects listed on FCA's website and that his hiring "should move things along quickly."  Calisi advised FCA that he hoped "to have something completed for your review with in [sic] a reasonable period of time." Calisi concluded his email by thanking FCA's Neubauer for his "patience and understanding." Eagle's email did not mention any amendment to the LOI.  FCA's Ex. 15, 3/10/14 Calisi email to Neubauer at CG000102.

In a March 20, 2014 email and letter, Calisi notified FCA that he had hired a third architect, William Pye (Pye), of the firm CDI Douglass Pye, Inc. located in Texas, to "fully execute" the proposed "Riverhead Chrysler Jeep Facility."  Calisi did not engage Pye until March 18, 2014.  Eagle's email did not mention any amendment to the LOI. Ex. 16, 3/18/2014 Pye letter to Calisi with enclosed agreement at EAMC00053-EAMC00058; FCA's Ex. 17, 3/20/14 Calisi letter to Freeman at EAMC00059; FCA's Ex. 18, Pye Deposition at 138(25)-139(2); FCA's Ex. 4, Calisi Deposition at 159(22)-160(21).

Calisi says he hired Pye to provide the "complete architectural plans and specifications for the facility," as required by the LOI. Ex. 4, Calisi Deposition at 156(16)-157(6).  However, Pye is not a licensed architect in New York and therefore could not provide architectural services in New York until he obtained a license, which Pye described as merely filling out some paperwork.  FCA's Ex. 18, Pye Deposition at 36 (16-21), 152 (7-18).

11

In an email dated April 17, 2014, Calisi advised FCA that he had met with Pye that day and that Pye had assured him that he would have "conceptual design docs for [Neubauer's] review shortly." FCA's Ex. 19, 4/17/14 Calisi email to Neubauer at EAMC00068. April 17, 2014 was the first time that Calisi had met Pye and the first time that Pye had visited the Proposed Site. FCA's Ex. 18, Pye Deposition at 78 (18-20); Ex. 6, Ferraro Deposition at 21(6-21). Eagle's email did not mention any amendment to the LOI.

On May 6, 2014, Pye sent his Conceptual Design Intent Package for Eagle (First Conceptual Design) to FCA enclosed with his letter to Neubauer dated May 6, 2014. Pye described the proposal as a "showroom renovation with a new separate ground up Service and Parts Facility located across the street from the proposed showroom. FCA's Ex. 20, 5/6/14 Pye letter to Neubauer at CG000192-CG000209. The First Conceptual Design was not complete architectural plans and specifications as required by the LOI. FCA's Ex. 4, Calisi Deposition at 210(18)-211(19).

Pye's letter states that "it is anticipated that the start of construction date for the showroom renovation would be September 15, 2014 with a completion date of April 15, 2015," and that the "anticipated start of construction date for the new build service shop and parts facility would be April 15, 2015 with a completion date of March 15, 2016." Pye noted that "these anticipated construction completion dates may require a revision to any construction completion dates stipulated in the [LOI]." FCA's Ex. 20, 5/6/14 Pye letter to Neubauer at CG000192; FCA's Ex. 4, Calisi Deposition at 206(12)-209(8).

Pye's proposal anticipated the completion of the showroom renovation over five months after the eight month deadline in the LOI, i.e. from October 27, 2014 to April 15,

12

2015; and Pye's proposal for the service and parts facility anticipated completion over 14 months after the eight month deadline, i.e. from October 27, 2014 to March 15, 2016. Ex. 20, 5/6/14 Pye letter to Neubauer at CG000192.  Pye conceded that his anticipated completion dates were based on an aggressive schedule that assumed all would go well, which as he cautioned, rarely happens.  FCA's Ex. 18, Pye Deposition at 94(5-22), 158(11-19).

Pye's letter further proposed that "until such time as the Service Shop Facility is completed and operational, existing Service repairs of Chrysler and Jeep product would have to occur at the existing Eagle Auto Mall Service Facility which also provides Service to other brands such as Kia, Volvo and Mazda."  Pye's proposal anticipated that the service and parts operation for Chrysler and Jeep would be shared, for at least 14 months, with the Kia, Volvo and Mazda vehicle lines, in the same building in which Chrysler and Jeep had been "dualed" with other automotive brands before the Old Chrysler bankruptcy in April 2009.  FCA's Ex. 20, 5/6/14 Pye letter to Neubauer at CG000192.

### b.  FCA's Response

FCA reviewed the First Conceptual Design at Eagle's request and notified Eagle by a letter dated June 2, 2014 that the First Conceptual Design was not acceptable because it did not meet the LOI requirements. FCA explained that:

(a) Eagle has not proposed an exclusive service department that would be operational within the timeframe of the LOI; and

(b) Eagle is proposing to use the basement of the showroom to meet [FCA] square footage requirements.  Splitting the showroom into two levels is not ideal,

13

and putting one level in the basement is not a good representation of the FCA

brands. The proposed layout would not optimize display and is not approved.

FCA invited Eagle to re-submit an amended proposal that would "provide a facility within

the specified timeframe as described within the LOI."  FCA's Ex. 21, 6/2/14 Freeman

letter to Calisi at EAMC00072; Ex. 4, Calisi Deposition at 212(18-22).

### c.  Eagle's Response to FCA

On June 9, 2014, Calisi responded to FCA's June 2, 2014 disapproval of the First

Conceptual Design by letter.  FCA's Ex. 4, Calisi Deposition at 215(21)-216(12),

220(3-13); FCA's Ex. 6, Ferraro Deposition at 83(11)-84(13).  In the letter, Calisi

acknowledged in his response that any resubmission by Eagle would have "to address

points A and B" in the FCA letter, i.e. an exclusive service facility that would be

operational within the time period specified in the LOI and a sales room design that did

not utilize the basement as display space.  Eagle promised in its June 9 response to

submit an "amended proposal for [FCA] architectural review in a timely manner." Calisi

thanked Freeman for "the courtesy that [FCA] has extended."  FCA's Ex. 22, 6/9/14

Calisi letter to Freeman at EAMC00075; FCA's Ex. 4, Calisi Deposition at

216(25)-217(18), 218(11-21); FCA's Ex. 6, Ferraro Deposition at 85(8)-86(24).

Eagle said nothing in its June 9, 2014 response about any amendment to the

LOI, including the alleged extension of the eight month time period within which Eagle

had agreed to complete its facility renovation, or the waiver of the exclusivity

requirement in the LOI.  FCA's Ex. 22, 6/9/14 Calisi letter to Freeman at EAMC00075;

Ex. 4, Calisi Deposition at 218(22)-220(2).

By email dated June 12, 2014, Pye sent FCA another package of documents that

14

he described as the "REVISED Conceptual Design Intent Package" (the Second

Conceptual Design).  Pye advised FCA that the documents propose the "removal of the

existing buildings and the construction of a new stand alone Chrysler Jeep dealership

facility that includes both Sales and Service in the same facility."  FCA's Ex. 23, 6/12/14

Pye email to Neubauer at CG000003-CG000016; Ex. 18, Pye Deposition at

176(10)-177(23).

 The Second Conceptual Design described a new and materially different

proposal than Eagle selected in the LOI; the new proposal was no longer just a

renovation, but instead involved the demolition of existing buildings and new

construction.  FCA's Ex. 4, Calisi Deposition at 234(11)-236(6); FCA's Ex. 6, Ferraro

Deposition at 84(14-21); FCA's Ex. 18, Pye Deposition at 111(16)-112(14) ("[T]his is a

new-build. . . . [T]his is a whole new Conceptual Design Intent Package.");

150(23)-151(4).

 The Second Conceptual Design did not contain an estimated construction start

date, an estimated completion date, or a date on which Eagle anticipated submitting the

complete architectural plans and specifications as required in the LOI. And, neither

Pye's letter, nor the Second Conceptual Design, mentioned any amendment to the LOI,

including any alleged extension of the eight month period to complete the renovation

selected by Eagle or the waiver of the exclusivity requirement.  FCA's Ex. 23, 6/12/14

Pye email to Neubauer at CG000003-CG000016.

 Pye estimated that his new proposal could take two years to complete from and

after the date plans were approved by FCA.  FCA's Ex. 18, Pye Deposition at

151(5-25), 152(19)-154(2).

As of the June 12, 2014 date that the Second Conceptual Design was submitted, final construction plans and specifications had not been submitted to FCA.  FCA's Ex. 4, Calisi Deposition at 237(24)-238(3), 294(21-25).  As of June 12, 2014, FCA had not had Chrysler or Jeep representation in the Riverhead market for over five years.

E.  This Case

On July 2, 2014, FCA notified Eagle of its repudiation of, and failure to perform, the LOI by filing a declaratory judgment action in state court against Eagle seeking judicial assistance in determining the parties' rights and obligations under the LOI, including FCA's right to terminate the LOI.  Doc. 1, Complaint; FCA's Ex. 24, 7/2/14 Freeman letter to Eagle at EAMC00100-EAMC00109; FCA's Ex. 4, Calisi Deposition at 246(4-14).

Prior to filing suit, Freeman called Calisi to inform him of FCA's decision to terminate the LOI, Calisi "pleaded" with Freeman -- "you knew" the plan; "how could you do this;" "Brian we agreed what I was going to do.  We agreed about the sales department. We agreed about the shared service. We agreed on this.  You were here."  Eagle's Exhibit A, Calisi Declaration, ¶ 21.

It should be noted that to date, Eagle has not provided FCA with complete architectural plans and specifications and has not begun any construction work relating to the Chrysler and Jeep facility.  Eagle also concedes that it does not yet have all of the permits and zoning approvals that would be necessary to complete the new construction that it proposed for the first time in June 2014.  FCA's Ex. 4, Calisi Deposition at 294(16-25).

16

III. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party may meet that burden "by 'showing' – that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). The revised Rule also provides the consequences of failing to properly support or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

17

Fed. R. Civ. P. 56(e).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, id. at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," Hager v. Pike County Bd. Of Education, 286 F.3d 366, 370 (6th Cir. 2002).

## IV.  Analysis

In its counterclaim, Eagle contends that the LOI was modified by an oral agreement between the parties or that the LOI does not reflect the parties' intent and must therefore be reformed.  Each is addressed in turn below.

### A.  Modification

#### 1.  In General

As noted above, the LOI provides expressly that it cannot be amended "without the prior written consent of [FCA's] National Dealer Placement Manager."  Eagle admits that no such writing exists.  Michigan law recognizes the validity of contractual provisions requiring amendments to be in writing to be effective and Michigan courts have enforced these provisions by barring alleged oral amendments to contracts.  See Dunn v. Bennett, 303 Mich. App. 767, 776 (2013) (affirming summary judgment where contract required amendments to be in writing and no evidence of a writing).

18

In order to amend a written contract under Michigan law, particularly a contract like the LOI requiring amendments to be in writing and signed by a specified person, Eagle must provide clear and convincing evidence that overcomes not only the substantive portions of the contract allegedly amended, but also the specific provision requiring amendments to be in writing. Quality Prods. & Concepts Co. v. Nagel Precision, Inc., 469 Mich. 362, 377 (2003); see Kovacs v. Elec. Data Sys. Corp., 762 F. Supp. 161, 164 (E.D. Mich. 1990) (holding that alleged "oral assurance [was] ineffective as a matter of law" because the contract required approval by specific officers before any modification could become effective, and oral statement was not made by one of the specified officers); Scarlett v. Allen, 295 Mich. 694, 703 (1940) (elements of proving amendment are same as proving existence of contract, including mutual assent); Cloverdale Equipment Co. v. Simon Aerials, Inc., 869 F.2d 934, 939 (6th Cir. 1989) ("[I]n light of a written-modification-only provision, vague assertions of an oral modification fail to raise a genuine factual issue sufficient to defeat a summary judgment motion."); Allstate Ins. Co. v. Harris (In re Harris), 474 B.R. 809, 814 (Bankr. E.D. Mich. 2012) ("A contract modification requires all of the normal requirements of a valid contract . . . .").

In this case, Eagle must come forward with legally sufficient evidence of FCA's assent to the alleged amendments at least to create a genuine issue of material fact as to FCA's agreement to Eagle's alleged modifications to the LOI . The record does not contain such evidence. Putting aside the fact that the there is no writing amending the LOI, let alone a writing signed by FCA's National Dealer Placement Manager as

19

required by the LOI.

## 2.  The New Build

Before discussing Eagle's evidence in support of its modification claim, it is important to describe what the alleged modifications Eagle says were made to the LOI. Eagle first alleges that FCA agreed to eliminate the LOI's express requirement to renovate an existing facility within eight months and instead agreed to "a newbuild site plan" within a "commercially reasonable amount of time."  Doc. 31, Amended Counterclaim ¶ 69.  Eagle says its allegation is based on alleged oral discussions with and conduct by certain FCA employees.  See FCA St. ¶ 52; Ex. 4, Calisi Depo. at 250(12)-251(22).

As an initial matter, FCA is correct that the alleged modification/amendment is no amendment at all, but an entirely new proposal.  Eagle itself admits that the "new build site plan" was materially different than the project agreed to in the LOI (see FCA St. ¶ 45), and that it would have taken at least another two years to complete the new proposal assuming that all went well (see id. at ¶ 47). And, Eagle did not even propose the "new build site plan" until June 2014, after more than three months of the eight month renovation period had expired.  See id. at ¶ 44.

Eagle has not identified any evidence that FCA ever agreed to the "new build site plan."  To the contrary, Eagle admits that, within 30 days of proposing the "new build site plan" in June 2014, FCA notified it via a July 2, 2014 letter that Eagle was in breach of the LOI for repudiating its obligation to complete the renovation of its facility within eight months. See id. at ¶ 48.8 Eagle also admits that, even as recently as the

20

December 2014 taking of its Rule 30(b)(6) deposition, it still does not have the necessary permits to construct the facility described in the "new build site plan," nor even the final construction plans and drawings.  See id. at ¶ 49.

### 3.  Extend 8 Months

#### a.

Eagle next says that FCA agreed orally to extend the eight month renovation deadline to an unspecified time in the future and to waive the requirement in the LOI, for at least two years, that the renovated facility be used exclusively for the display, sale and service of Chrysler and Jeep vehicles.

As FCA points out, this alleged modification contradicts and is irreconcilable with Eagle's claim that FCA agreed to a "new build site plan" in lieu of the eight month renovation project described in the LOI.  Eagle can't have it both ways, i.e., the project that Eagle claims is at issue cannot be both a "new build site plan" and a renovation, both with their own respective completion dates.  However, the claimed modification is discussed below.

#### b.

Eagle first bases its claim for modification on a conversation that took place on February 10, 2014 during which Calisi spoke with the two local FCA employees who were visiting the site of the proposed renovation.  Calisi claims that they agreed, at that first meeting, to extend the eight month deadline and waive the exclusivity requirement of the LOI.  According to Calisi, he told the FCA employees that he planned to renovate

21

a building for the sale of Chrysler and Jeep vehicles, construct a separate building for Chrysler and Jeep parts and service operations, and, during construction of the parts and service building, operate Chrysler and Jeep parts and service from the same Volvo, Mazda and Kia building where Eagle had "dualed" Chrysler and Jeep before the Old Chrysler bankruptcy.  FCA's Ex. 4, Calisi Depo. at 52(4)-53(3); 84(13)-88(14); 164(25)-166(2).

Calisi does not say that the FCA employees said "yes" to his proposal, just that they did not say "no" and that they must have understood the proposal would take longer than eight months to complete.  Eagle has not identified no evidence of any authority that these FCA employees had to amend the LOI on FCA's behalf.  Further, even Calisi admits that these employees did not agree on a specific deadline to replace the eight month completion date and that he considered the new deadline to be "open-ended."  See FCA St. ¶ 53; FCA's Ex. 4, Calisi Depo. at 166(22)-170(3); 213(13-19).  Calisi also concedes that the "standard" comment of these FCA employees, during his conversations with them, was that Calisi should put all proposals in writing so that they could submit the proposals to "Detroit," i.e. FCA corporate headquarters, for review. Ex. 4, Calisi Depo. at 276(22)-277(15).

Assuming Calisi's testimony is true for the purposes of summary judgment, the fact remains that there is no writing signed by FCA's National Dealer Placement Manager agreeing to the alleged amendments, and in any event neither of these FCA employees had authority to agree to changes in the LOI.  See Ex. 3, LOI at ¶ 16 (only FCA's National Dealer Placement Manager had authority to agree to amendments);

22

FCA St. ¶ 13.  Thus, the February 10, 2014 conversations, whatever they were, simply do not rise to the level of evidence to create a genuine issue of material fact as to whether the LOI was modified as to the 8 month time frame or the exclusivity provision.

There are other problems with Eagle's reliance on the February 10, 2014 conversations.  First, all of the alleged statements by these FCA employees were made before the February 27, 2014 Effective Date of the LOI.  The LOI contains an integration clause which provides expressly that the LOI constitutes the parties' entire agreement, and supersedes "all of their prior negotiations, understandings, correspondence and agreements relating to [the] subject matter [of the LOI.]" See FCA St. ¶ 13.

Second, more than two weeks after the alleged February 10 discussions where, according to Eagle, the eight month deadline allegedly was extended indefinitely, FCA sent an email to Eagle on February 28, 2014 attaching a copy of an internal bulletin confirming that Eagle had been issued an "8 month Letter Of Intent to Renovate an existing facility in Riverhead, NY."  See id. at ¶ 21.  FCA also confirmed in its email the effectiveness of the LOI that contains both the eight month deadline and the exclusivity provision that Eagle now argues were amended over two weeks before.

Third, Eagle's conduct after the alleged February 10 discussion is consistent with the LOI as written, but not with the LOI as allegedly amended.  By a letter dated February 28, 2014, FCA notified Eagle that its proposed site in Riverhead had been approved and asked Eagle to submit its facility plans as outlined in the LOI for review by "our home office."  See id. at ¶ 28.  Eagle responded not with a statement that the eight month deadline had been extended indefinitely, or that the exclusivity requirement had

been waived for at least two years, but instead with an email enclosing what it referred to as plans for the renovation.  See id. at ¶ 29.

Similarly, Eagle represented in a March 14, 2014 letter to FCA that its letter was being sent in accordance with the LOI and even specified the precise provision in the LOI that it believed was applicable ("page 1, bullet 3 within 30 days"), but nowhere even mentions the oral amendments that it now claims were made to the LOI before the date of its letter. See id. at ¶ 30.  In a letter dated May 6, 2014—nearly three months after the alleged oral amendment of the LOI—Eagle's architect notified FCA that, based on his estimate of project completion dates, "any construction completion dates stipulated in the [LOI]" may have to be revised.  See id. at ¶ 37 (emphasis added).  This reference to an extension of the completion date in the LOI would not have been necessary if the deadline already had been modified as alleged back in February.

Finally, in a June 9, 2014 letter Eagle is again is explicit that the LOI's eight month deadline and exclusivity requirement remain in effect. See id. at ¶¶ 41-42. Eagle's June 9 letter responds to FCA's June 2, 2014 letter advising Eagle that the proposal submitted by Eagle's architect was not acceptable because it failed to comply, inter alia, with the requirements of the LOI within the time periods specified, i.e. within eight months of the February 27, 2014 Effective Date.  FCA also specifically referenced Eagle's failure to propose an exclusive service department that would be operational within the LOI's time periods. Eagle responded to FCA's letter not by claiming that the eight month deadline had been extended indefinitely, or that the exclusivity requirement had been waived for at least two years, but instead by promising to submit a revised

24

proposal that would address FCA's concerns about deadlines and exclusivity as required in the LOI.  See id.

c.

The second communication with an FCA employee that Eagle says is evidence of an oral amendment to the LOI is an alleged statement by FCA employee, Freeman, to the effect that FCA would work with Eagle on the eight month completion deadline in the LOI. Calisi alleges that, during a phone call with Freeman in May 2014 concerning the possibility of a variance for an arch on the showroom building and the potential delay in the renovation, Freeman told him: "[W]ell that question comes up all the time about timelines with other dealers….[D]on't worry about it. We'll cross that bridge when we get to it."

This is not sufficient evidence of modification.  Freeman had no authority to amend the terms of the LOI.  Even if he did, his alleged oral statements fall far short of the "agreement," including the element of mutual assent, that is required to prove an amendment to a contract.

d.

In the end, Eagle still has failed to show that FCA agreed to the alleged extension of the eight month deadline or waiver of the "exclusive facility" requirements, in the LOI.  When asked during discovery to identify when FCA allegedly agreed orally to these amendments, who allegedly agreed on FCA's behalf, and what they said that allegedly constituted FCA's agreement, Eagle could identify only two discussions with non-management FCA employees, which fall far short of establishing any genuine

25

issues of material fact as to the essential element of FCA's assent.

### 4.  Overall

Putting aside all of the deficiencies in Eagle's evidence of modification, there is yet another problem with the alleged modifications which precludes a finding that there is a genuine issue of material fact as to whether the LOI was modified.  The alleged oral amendments are much too vague to be enforced and do not rise to the level of a "contract" between the parties.  See id. at ¶ 53 ("They never specified a period of time.").  An amended contract, like any agreement, must contain specific and enforceable terms.  See Scarlett, 295 Mich. at 703 ("While no particular form is required, mere indefinite expressions cannot constitute a modification.").  According to Eagle, the alleged new agreement between the parties "was very loose … there was not a clock … [t]hey never specified a period of time."  See FCA St. ¶ 53.  This cannot form the basis for a valid modification.

### B.  Reformation

#### 1.  In General

There is a heavy presumption under Michigan law that "a deliberately prepared and executed [agreement] manifest[s] the true intention[s] of the parties, especially between counseled businessmen," and that "a correspondingly high order of evidence is required to overcome that presumption."  JP Morgan Chase Bank, N.A. v. Winget, 901 F. Supp. 2d 955, 972 (E.D. Mich. 2012) (quoting Citibank, N.A. v. Morgan Stanley & Co., 797 F. Supp. 2d 254, 265 (S.D.N.Y. 2011)). It is true that a court of equity is empowered to reform a contract, but only when necessary to make it conform to the

26

agreement actually made by the contracting parties.  See Casey v. Auto–Owners Ins. Co., 273 Mich. App. 388, 398 (2006).  One of the grounds upon which a contract may be reformed is when the contract "fails to express the intention of the parties because of a mutual mistake," which occurs where the parties shared and relied upon an erroneous belief about a material fact at the time the contract was executed.  Scott v. Grow, 301 Mich. 226, 237 (1942).

Put simply, the doctrine of contract reformation is simply inapplicable to the evidence in this case.  Eagle has offered no evidence of the agreement "actually made by the parties" that it claims is not reflected in the LOI.  Similarly, Eagle has offered no evidence that the terms of the LOI failed to reflect the true intentions of the parties at the time the LOI was executed.  There is no evidence that as of the date of contracting, that the parties intended to agree on the provision of a facility even if it would require an "open-ended" completion deadline or a waiver of the exclusivity requirement for two years or more.  To the contrary, the specified time periods and exclusivity requirement in the LOI were material terms.

### 2.  Eagle's Reformation Claim

Eagle's reformation claim is really a re-packaging of its modification claim.  Eagle claims the parties "mistakenly believed that either a renovation or new-build project could be completed under the time limits" of the LOI.  Doc. 31, Amended Counterclaim ¶ 72.  Based on this alleged "mistake," Eagle asks the Court to write a new contract that allegedly "match[es] the Parties' (actual) intent," which Eagle says would include "a commercially reasonable time period to comply with the Parties' agreement to move

27

forward with a new build facility rather than a renovation." Id. at ¶ 77.  Eagle also asks the Court to "remove [FCA's] discretion" from the LOI and "provide deadlines and duties in conformance with [FCA's] custom of providing prompt feedback, guidance and leeway in completing the Dealership project."  Id.

### 3. Discussion

Eagle's reformation claim lacks merit.  First, Eagle has provided no evidence that the parties actually agreed "to move forward with a new-build facility rather than a renovation" and mistakenly failed to include that agreement in the LOI.  Under the LOI, Eagle had three facility choices.  One was to construct a new facility within 18 months. Eagle, however, selected the option to renovate an existing facility in eight months. There was no mistake by either party, let alone the type of mutual mistake that is required before an integrated written contract between sophisticated businesses is reformed.

Here, both the eight month performance deadline and the exclusivity provision in the LOI are unambiguous.  Eagle has never argued otherwise.  The LOI is clear that FCA has no obligation to extend the eight month deadline, Eagle's failure to perform by that date is a material breach that enables FCA to terminate the LOI, and the LOI expires eight months after the effective date of the LOI, i.e. on October 27, 2014.

Nevertheless, Eagle bases its reformation claim on a discussion with FCA employees that occurred on Feb. 10, 2014, after Eagle signed the LOI.  Again, Eagle points to Calisi's testimony that after advising the FCA employees that Eagle's renovation plan would take longer than eight months, they allegedly assured Eagle that

28

everything "looks great" and that "we are moving forward."  It is based on these statements that Eagle asks the Court to reform the LOI it signed in January 2014 to include a "commercially reasonable time period" to perform, in lieu of eight months, and to delete the exclusivity requirement for however long Eagle takes to perform.

Putting aside that Eagle has not cited any authority for the proposition that a party who signed a contract may ask a court to reform it based on discussions that occurred after that party signed the contract, the record does not support a finding of a mistake, unilateral or mutual.  On Feb. 27, 2014—after the Feb. 10 conversations Eagle relies on to support its reformation claim—FCA signed the LOI that Eagle had signed a month before, with the same eight month deadline and the same exclusivity requirement, and caused it to be delivered to Eagle. FCA also emailed Eagle the next day, confirming that the LOI had been approved and explicitly confirming the LOI's eight month deadline.  As discussed in detail above, over the next four months, Eagle sent emails and letters to FCA that never referred to any extension of the eight month deadline or waiver of the exclusivity requirement.

Even assuming for purposes of summary judgment that Eagle had been "mistaken" about the language in the LOI, "[a] unilateral mistake is not sufficient to warrant reformation."  Casey v. Auto Owners Ins. Co., 273 Mich. App. 388, 398 (2007). Rather, "[t]o obtain reformation, a plaintiff must prove a mutual mistake of fact, or mistake on one side and fraud on the other, by clear and convincing evidence."  Id. (emphasis added).

Here, Eagle attempts to show fraud.  According to Eagle, FCA executed the LOI

29

knowing that Eagle's understanding differed from the express language in the LOI, and FCA allegedly failed to inform Eagle that FCA would demand strict compliance with the LOI. These allegations, even if true, do not constitute fraud sufficient to justify reformation. Rather, the record shows that the parties proceeded under the LOI. The fact that Eagle was unable to comply with its terms does not warrant reformation. Nothing in the LOI or the record shows any ambiguity or deviation from the terms of the LOI to invoke reformation.

Eagle is a sophisticated business with years of experience as an automotive dealer at the time of contracting, and had actual construction experience on the same Riverhead site where it agreed to renovate a facility for the exclusive display, sale and service of Chrysler and Jeep vehicles. See id. at ¶ 24. Eagle concedes that, at the time of contracting, it understood that the eight month completion date might be difficult to meet. FCA's Ex. 6, Ferraro Depo. at 79(18)-80(6). Nevertheless, Eagle signed the LOI, FCA signed the LOI and the parties moved forward based on its terms.

What Eagle really is asking for is not reformation but a re-writing of the LOI for Eagle's benefit. Eagle asks the Court establish "open-ended" commercially reasonable time periods for the completion of its contractual obligations. It also asks the Court to change the parties' bargain by transforming a renovation project that would have had Eagle back in business in eight months to a "new build site plan" proposal that, even if it went forward would take more than two years to complete. To do so, Eagle asks the Court to "remove [FCA's] discretion" from the parties' agreement and to provide "deadlines and duties" in conformance with what Eagle describes vaguely as FCA's

30

"custom of providing prompt feedback, guidance and leeway" in the renovation or construction of dealership facilities.  Doc. 31, Amended Counterclaim ¶ 77.  This request is well beyond reformation.

### 4.  Reformation due to Impossibility

In its response and supplemental filings, Eagle argues the doctrine of impossibility of performance somehow justifies "re-writing" the LOI.  Eagle says that the LOI should be reformed based on the impossibility of its performance, namely, its failure to perform within the time period it selected in the contract that it signed.  This doctrine is employed only to excuse performance via rescission of the contract.  <u>See Roberts v. Farmers Ins. Exchange</u>, 275 Mich. App. 58, 73 (2007) ("A promisor's liability may be extinguished in the event his or her contractual promise becomes objectively impossible to perform." (emphasis added)).  The alleged impossibility here is not the kind that would support rescission.  Moreover, Eagle has not asked for recission.

### C.  Res Judicata and Collateral Estoppel

FCA also says that Eagle's claims to modify or reform the LOI are barred by res judicata and/or collateral estoppel due to the litigation between the parties in the Southern District of New York.  As noted above, in 2010, Eagle sued FCA claiming, inter alia, that FCA had failed to provide it with the "customary and usual" letter of intent required by Section 747.  After a trial on the merits, the EDNY ruled "that there is overwhelming evidence" that the LOI is "customary and usual" and "therefore complied fully with [Section 747's] requirements."  Eagle appealed.  The Second Circuit affirmed.

Eagle's claims for modification or reformation as alleged in this case are not

31

precluded because of prior litigation.  The issue in the prior litigation was whether the
terms in the LOI were customary and usual.  It has been established that they are.
Eagle has not litigated this issue.  The issue is this case in terms of the Eagle's
counterclaim, is whether the parties modified the LOI or whether it should be reformed.
Res judicata or collateral estoppel does not apply.

## V.  Conclusion

When all is said and done, Eagle's attempt to turn conversations and stray
statements into something more is unavailing.  Eagle cannot avoid the clear terms of
the LOI.  The fact that Eagle entered an agreement that it apparently could not fulfill
does not permit it to come to Court to ask for modification or reformation.

FCA's motion for summary judgment on Counts I and II of Eagle's Amended
Counterclaim is GRANTED.

The Clerk shall schedule a status conference to chart the course of Phase II of
this case.

SO ORDERED.

S/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated: August 17, 2015
        Detroit, Michigan

32